*Attachment 3 to Resolution Agreement*
*In re: Inotiv, Inc.*

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

6/3/2024

LAURA A. AUSTIN, CLERK
BY:   s/ CARMEN AMOS
DEPUTY CLERK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **Case No. 6:24CR16** |
| **v.** | ) | |
| | ) | **Violations: 18 U.S.C. § 371** |
| | ) | **7 U.S.C. § 2149(d)** |
| **ENVIGO RMS, LLC** | ) | **33 U.S.C. §§ 1311, 1319(c)(2)(A)** |
| **ENVIGO GLOBAL SERVICES, INC.** | ) | |

## INFORMATION

The United States Attorney and the Assistant Attorney General for the Environment and Natural Resources Division of the United States Department of Justice charge that:

## COUNT ONE

## I.    INTRODUCTORY STATEMENT

1.    ENVIGO RMS, LLC ("ENVIGO RMS") and other persons conspired, in violation of 18 U.S.C. § 371, to knowingly violate the Animal Welfare Act, 7 U.S.C. § 2131 *et seq.* and the standards, rules, and regulations promulgated thereunder (hereinafter collectively referred to as the "AWA"), by failing to provide, among other things, adequate veterinary care, adequate staffing, and safe and sanitary living conditions for the dogs housed at ENVIGO RMS's dog breeding facility located in Cumberland County, Virginia ("Cumberland Facility"). Despite being on notice since at least July 2021 that the conditions at the Cumberland Facility fell below the AWA's minimum standards,

*Attachment C to Plea Agreement*
*United States v. Envigo RMS, LLC & Envigo Global Services, Inc.*

ENVIGO failed to take the necessary steps to ensure that the Cumberland Facility complied with the AWA.

2.      In addition, ENVIGO GLOBAL SERVICES INC. (collectively, with ENVIGO RMS, "ENVIGO") and other persons conspired, in violation of 18 U.S.C. § 371, to violate the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.*, by failing to properly operate and maintain the wastewater treatment plant at the Cumberland Facility. ENVIGO's failure to properly repair, operate, and maintain its wastewater treatment plant resulted in exceedances of effluent limits, unauthorized discharges, and unsanitary conditions.

## II.      <u>OVERVIEW AND BACKGROUND</u>

### <u>DEFENDANTS AND CORPORATE STRUCTURE</u>

3.      ENVIGO RMS, a Delaware limited liability company, was a wholly owned subsidiary of Envigo RMS Holding Corp., an Indiana corporation. Envigo RMS Holding Corp. was formed on April 9, 2019, in anticipation of the acquisition of animal breeding facilities held by another business entity, hereinafter referred to as Corporation A, which included the Cumberland Facility.

4.      ENVIGO RMS, headquartered in Indianapolis, Indiana, conducted business in the pharmaceutical and biotechnology industries. On June 3, 2019, ENVIGO RMS registered to transact business in the Commonwealth of Virginia as a foreign limited liability corporation.

5.      Envigo RMS Holding Corp., through restructuring acquired Corporation B, a foreign for-profit corporation formed in Pennsylvania, with a principal place of business in Denver, Pennsylvania. On August 1, 2019, Corporation B was renamed ENVIGO GLOBAL SERVICES, INC. On August 8, 2019, ENVIGO GLOBAL SERVICES, INC. filed an assumed business name filing with the Indiana Secretary of State that it would conduct business under the name of Envigo Research Products, Inc. Hereinafter, both ENVIGO GLOBAL SERVICES, INC. and Envigo Research Products, Inc. will be collectively referred to as "EGSI."

6.      Among other things, ENVIGO bred, exported, and sold research-quality animals for medical and scientific research purposes at the Cumberland Facility located within the Western District of Virginia. EGSI owned the Cumberland Facility and paid the salaries of the employees, including attending veterinarians, that worked at the Cumberland Facility. ENVIGO RMS at times paid the salaries of attending veterinarians. ENVIGO held the regulatory licenses and/or the permits necessary for the business to operate.

7.      Commercial animal dealers, like ENVIGO, are regulated and licensed by the United States Department of Agriculture ("USDA"), Animal and Plant Health Inspection Service ("APHIS"). APHIS issues a Class A license to dealers who sell animals that are bred and raised at the dealer's facility in a closed or stable colony.

8.      ENVIGO RMS applied to APHIS for a Class A license around June 2019. By signing the application form, ENVIGO RMS acknowledged that it had reviewed and

agreed to comply with the AWA. APHIS issued Class A dealer license 32-A-0774 to ENVIGO RMS. The license covered the Cumberland Facility.

9.      On September 21, 2021, Inotiv, Inc., a pharmaceutical development company, agreed to purchase ENVIGO. The purchase was completed on November 5, 2021. The Cumberland Facility remained an approved site under ENVIGO RMS's AWA license 32-A-0774.

10.     As a licensed animal dealer, ENVIGO's facilities were subject to ongoing inspection by APHIS to ensure it operated in compliance with the AWA. APHIS concluded each inspection with the issuance of an inspection report documenting any violations found, the severity of those violations, and a date by which ENVIGO needed to correct those violations.

<u>ENVIGO'S CUMBERLAND, VIRGINIA FACILITY</u>

11.     The Cumberland Facility, which is located at 482 Frenchs Store Road, Cumberland, Virginia, is identified as Site 005 on the inspection reports prepared by APHIS for license 32-A-0774.

12.     The Cumberland Facility is a large multi-building commercial animal breeding facility that housed upwards of 5,000 dogs at any given time. In 2019, the Cumberland Facility shipped 4,795 beagles to purchasers, amounting to approximately $4,716,686 in sales. In 2020, the Cumberland Facility shipped 4,085 beagles to purchasers, amounting to approximately $4,442,030 in sales. In 2021, the Cumberland Facility shipped 4,675 beagles to purchasers, amounting to approximately $5,044,888 in sales. Between

January 2022 and May 2022, the Cumberland Facility shipped 1,439 beagles to purchasers,

amounting to approximately $1,625,648 in sales. ENVIGO kept an average of 4,874 dogs

per month on site in 2019, 5,378 dogs per month on site in 2020, and 5,134 dogs per month

on site in 2021.

13.     The Cumberland Facility consisted of multiple large kennel buildings, office

buildings, storage facilities, medical facilities, maintenance facilities, an incinerator, and a

wastewater treatment plant, as depicted in Photograph 1 below.

**Photograph 1.** Aerial photograph of the Cumberland Facility (Source: Google Maps).



14.     The Cumberland Facility's onsite employees included a site director,

manager of operations, administrative and maintenance personnel, animal technicians, and

an attending veterinarian. ENVIGO's "Executive Leadership Team" was offsite, primarily

in the United States. The Executive Leadership Team consisted of the Chief Executive Officer, Chief Finance Officer, Chief Operating Officer ("COO"), Senior Vice President of Veterinary Services ("SVP-VS"), Senior Vice President of Human Resources, and the Senior Vice President of Commercial. ENVIGO's SVP-VS and Chief Finance Officer were in the United Kingdom.

### III.   ANIMAL WELFARE ACT

15.    The AWA establishes minimum standards of care and treatment to be provided for certain animals bred and sold for use as pets, used in biomedical research, transported commercially, or exhibited to the public. 7 U.S.C. § 2131 *et seq.*; 9 C.F.R. §§ 2.1-3.20.

16.    The AWA is administered by the Secretary of Agriculture or his representative. 7 U.S.C. § 2151. The AWA authorizes the Secretary to "promulgate such rules, regulations, and orders as he may deem necessary in order to effectuate the purposes of [the AWA]." 7 U.S.C. § 2151. The Secretary has delegated his authority to the APHIS Administrator.

17.    The Secretary has promulgated regulations and standards to govern the humane handling, care, treatment, and transportation by dealers, which includes the minimum requirements for adequate veterinary care and housing. 7 U.S.C. § 2143(a)(1), (a)(2)(A); 9 C.F.R. §§ 3.1, 3.20. Dealers must comply in all respects with these regulations and standards. 7 U.S.C. § 2149(d); 9 C.F.R. §§ 2.1-3.20.

18.    When construing or enforcing the provisions of the AWA, the act, omission, or failure of any person acting for or employed by a dealer is deemed the act, omission, or failure of the dealer. 7 U.S.C. § 2139.

19.    The AWA defines a "dealer" as "any person who, in commerce, for compensation or profit, delivers for transportation, or transports, except as a carrier, buys, or sells, or negotiates the purchase or sale of, (1) any dog or other animal whether alive or dead for research, teaching, exhibition, or use as a pet [. . . .]" 7 U.S.C. § 2132(f); *see also* 9 C.F.R. § 1.1 (definition of "dealer").

20.    A "person" includes any "individual, partnership, firm, joint stock company, corporation, association, trust, estate, or other legal entity." 7 U.S.C. § 2132(a).

21.    Anyone who falls within the statutory definition of a dealer must obtain and maintain a valid license from the Secretary. 7 U.S.C. § 2134; *see also* 9 C.F.R. § 2.1(a)(1) (licensing requirements).

22.    The Secretary will issue a license to a dealer upon application, provided that no such license will be issued until the dealer has demonstrated that his facilities comply with the standards promulgated by the Secretary pursuant to 7 U.S.C. § 2143. 7 U.S.C. § 2133.

23.    By signing the application form, the applicant acknowledges that it has reviewed the AWA and agrees to so comply. 9 C.F.R. § 2.2.

24.     The AWA requires the Secretary to make investigations and inspections as necessary to determine whether any dealer has violated any provision of the AWA. 7 U.S.C. § 2146(a).

25.     Animal Care is a program under APHIS, which, as relevant here, is tasked with conducting the inspections to ensure compliance with promulgated regulations and standards, and ultimately, ensuring the humane treatment of animals covered by the AWA.

26.     A routine inspection is an unannounced, complete inspection of every aspect of the facility that is regulated under the AWA. A focused inspection may include re-inspection for direct noncompliances identified during a previous inspection; re-inspection for a specific noncompliance identified during a previous inspection; a partial inspection of the facility, such as animals only or records only; or a partial inspection to follow up on a public complaint concerning animal welfare.

27.     During an inspection, inspectors must document critical and direct violations of the AWA. A critical noncompliance is one that has a serious or severe adverse effect on the health and well-being of the animals. A direct noncompliance is a critical noncompliance that is having a serious or severe adverse effect on the health and well-being of the animal at the time of the inspection.

28.     The AWA further mandates that the Animal Care inspector shall have access to the place of business and the facilities, animals, and records. 7 U.S.C. § 2146(a); 9 C.F.R. § 2.126.

## IV.    FACTUAL BACKGROUND

<u>INSPECTION HISTORY OF THE CUMBERLAND FACILITY</u>

29.    Between July 2021 and May 2022, ENVIGO amassed over 60 citations at the Cumberland Facility for non-compliance with the AWA. More than half of those citations were deemed critical or direct, the most serious types of citation.

30.    The first inspection by APHIS of the Cumberland Facility following ENVIGO's acquisition of the site took place in August 2019. It was a focused inspection and included no citation. APHIS did not inspect the Cumberland Facility in 2020. The next APHIS inspection of the Cumberland Facility was in July 2021. During the routine inspection, APHIS documented violations of 18 different provisions of the AWA, of which 10 of the violations were deemed to be direct or critical.

31.    APHIS conducted subsequent inspections of the Cumberland Facility over the next several months. At each inspection APHIS documented violations, many of which were direct and critical. APHIS also cited ENVIGO for multiple repeat violations, including noncompliant items APHIS identified as early as the July 2021 inspection. By the March 2022 inspection, ENVIGO had been on notice that it needed to correct its violations for eight months. ENVIGO had undertaken a series of actions to address the non-compliant items identified by APHIS. The actions were insufficient; APHIS cited ENVIGO for five violations of the AWA at the March inspection. All were repeat violations, and two were direct violations. On May 3, 2022, during the course of a focused inspection, APHIS cited ENVIGO for one repeat violation.

32.    On May 18, 2022, the USDA Office of Inspector General and other law enforcement began executing a multi-day federal search warrant at the Cumberland Facility. While on site, law enforcement and experts assisting in the execution of the warrant determined that serious and adverse conditions continued to exist at the Cumberland Facility.

33.    Pursuant to the warrant, 445 beagles from the Cumberland Facility were seized after they were found to be in acute distress by two licensed veterinarians. Acute distress means any animal requiring immediate veterinary treatment or other care to promptly alleviate a life-threatening illness, injury, or any suffering, as deemed by a licensed veterinarian.

34.    On May 19, 2022, the United States filed a civil Complaint for Declaratory and Injunctive Relief and an Emergency Motion for Temporary Restraining Order against ENVIGO RMS in the United States District Court for the Western District of Virginia. On May 21, 2022, the Honorable District Judge Norman K. Moon granted the government's motion and issued a Temporary Restraining Order. On June 17, 2022, the Court granted a preliminary injunction.

35.    By September 6, 2022, and pursuant to a consent agreement, ENVIGO transferred all the remaining beagles out of the Cumberland Facility, ending commercial operation at the Cumberland Facility.

36.    ENVIGO ceased operations at the Cumberland Facility as of January 24, 2024.

*Attachment 3 to Resolution Agreement*
*In re: Inotiv, Inc.*

## INADEQUATE VETERINARY CARE

37.     ENVIGO and its predecessor hired and retained an inadequate attending veterinarian, hereinafter "AV," from May 2018 through April 2022, and failed to establish and maintain a program of adequate veterinary care at the Cumberland Facility, all in violation of the AWA. *See* 9 C.F.R. § 2.40(a) (Each dealer must employ an "attending veterinarian," who must "provide adequate veterinary care to [the dealer's] animals in compliance with [the AWA]." The dealer must "assure that the attending veterinarian has appropriate authority to ensure the provision of adequate veterinary care and to oversee the adequacy of other aspects of animal care and use."). Additionally, the dealer "must follow an appropriate program of veterinary care for dogs that is developed, documented in writing, and signed by the attending veterinarian." 9 C.F.R. § 3.13(a). The AWA requires the program of veterinary care to include specific requirements to ensure the humane treatment of animals. *See*, *e.g.*, 9 C.F.R. § 2.40(b) (requirements for physical examinations, vaccines, and preventative care); 9 C.F.R. § 2.40(b)(2) (treatment of diseases and injuries, availability of off-hours care); 9 C.F.R. § 2.40(b)(3) (daily observation and communication between veterinarian and staff); 9 C.F.R. § 2.40(b)(4) & (5) (anesthesia, euthanasia, and procedural requirements).

38.     ENVIGO RMS's predecessor, Corporation A, conducted an interview process for an attending veterinarian at the Cumberland Facility in 2018. The hiring process was led by Corporation A employees who became ENVIGO employees after the 2019 business acquisition. AV was interviewed and ultimately selected as part of that process.

*Attachment 3 to Resolution Agreement*
*In re: Inotiv, Inc.*                                                                                        **Information**

During AV's interview process, Corporation A's site supervisor expressed concerns over the selection of AV. Even so, Corporation A hired AV. After ENVIGO RMS acquired the Cumberland Facility on June 3, 2019, ENVIGO continued to employ AV despite continued employee complaints about AV's adequacy as a surgeon and as a supervisor of technicians, a communication breakdown between AV and employees, and AV's failure to show up for work. Repeated complaints by site supervisors and requests to remove AV as the attending veterinarian were denied or ignored by the Vice President of North American Operations ("VP-NOA") and members of the Executive Leadership Team, including the COO and the SVP-VS, who was AV's direct supervisor.

39.     The SVP-VS was aware of a multitude of ongoing concerns with AV's adequacy as a veterinarian. Shortly after AV was hired, and continuing until she eventually resigned from her position, the SVP-VS received numerous requests to remove AV as the attending veterinarian. Rather than terminate AV, the SVP-VS and other members of the Executive Leadership Team worked to provide AV additional resources and support, and SVP-VS met with AV, other members of the Executive Leadership Team, and site supervisors to monitor AV's performance. Nonetheless, although the SVP-VP was AV's direct supervisor and was aware of concerns regarding the adequacy of AV's performance for years, he never terminated or recommended termination of AV.

40.     For example, in February 2021, the Cumberland Facility site supervisor observed AV mishandle the surgeries of five dogs. Immediately thereafter, the site

supervisor provided the COO, SVP-VS, and Senior Human Resource Business Partner with a log of concerns regarding AV's abilities.

41.     Shortly thereafter, and after further investigation, the Senior Human Resources Business Partner recommended to the COO, VP-NOA, and SVP-VS that AV be terminated. The COO, VP-NOA, and the Senior Vice President of Human Resources decided to retain AV despite this recommendation.

42.     Although the site supervisor also recommended hiring a new veterinarian to replace AV, the COO refused to fire AV claiming it was hard to find a veterinarian for the Cumberland Facility.

43.     Staff rejection of AV's authority paired with AV's inadequate veterinary skills led to multiple additional improper and inadequate veterinary practices at the Cumberland Facility, including, but not limited to: ENVIGO employees on multiple occasions failed to follow euthanasia practices and instead used euthanasia methods causing pain and suffering to dogs; and ENVIGO employees on multiple occasions withheld anesthesia from conscious dogs before performing intracardiac injection euthanasia.

44.     AV also failed to ensure healthy dogs left the Cumberland Facility when fulfilling orders to ENVIGO's clients. At times, AV failed to perform adequate head to toe health checks of the dogs before shipment. In some instances, dead and sick animals were received by clients. Clients complained to ENVIGO that the dogs they received in

shipments were unhealthy. The Executive Leadership Team knew of these issues but continued to employ AV and allowed the dogs to be shipped.

45.    AV's lack of oversight at the Cumberland Facility also involved the falsification of records. ENVIGO employees knowingly falsely signified they recorded temperatures for refrigerated medications for several months when they had not.

46.    ENVIGO refused to terminate AV even though members of the Executive Leadership Team knew AV was not providing adequate veterinary care to the dogs at the Cumberland Facility, which contributed to 445 animals classified in acute distress and needing immediate medical attention by two licensed veterinarians during the May 2022 federal search warrant.

47.    AV resigned from her position as attending veterinarian at the Cumberland Facility in April 2022.

<u>FAILURE TO PROVIDE POTABLE WATER TO DOGS</u>

48.    The AWA mandates that potable water – that is, water suitable for drinking – must be continuously available to dogs unless restricted by the attending veterinarian. 9 C.F.R. §§ 3.10(a), 3.1(d). ENVIGO failed to abide by the AWA's requirement to provide potable water at the Cumberland Facility.

49.    ENVIGO knew the water provided to the dogs at the Cumberland Facility was not suitable for drinking and provided bottled water and water coolers for its employees. At other times, ENVIGO posted a "Boil Water" notice for its employees at the

facility. Notwithstanding, and in violation of the AWA, ENVIGO continued to provide the non-potable water to the dogs at the facility.

50.     The AWA also mandates that potable water be used for cleaning and other husbandry requirements. 9 C.F.R. § 3.1(d). ENVIGO violated this requirement, and several other sanitation-related restrictions, by using the contaminated well water to power wash kennels, creating an increased risk of disease.

## INADEQUATE HOUSING AND PRIMARY ENCLOSURES

51.     ENVIGO violated several provisions of the AWA at the Cumberland Facility by failing to ensure that the primary enclosures at the facility provided the required flooring space to each dog and were constructed and maintained in a manner to protect dogs from injury. *See*, *e.g.*, 9 C.F.R. § 3.6(a)(2)(ii), (c)(1)(i).

52.     The AWA required ENVIGO to provide each dog, nursing mom, and puppy, a minimum amount of floor space. 9 C.F.R. § 3.6(c)(1)(i), (ii). ENVIGO failed to house dogs, including nursing mothers and their puppies, in kennels with the required floor space.

53.     In July 2021, APHIS found 62 nursing mothers and their 393 puppies housed in enclosures at the Cumberland Facility that failed to provide the minimum amount of floor space required by the AWA.

54.     At the Cumberland Facility, ENVIGO housed as many as nine puppies in an enclosure measuring 16 square feet. The AWA requires that enclosures containing that many puppies be at least 21.8 square feet. 9 C.F.R. § 3.6(c)(1)(i). APHIS inspectors found additional overcrowded enclosures in another building containing 15 enclosures with four-

to-five-month-old beagles. APHIS inspectors determined that enclosures in another room measured a total of 39.7 square feet. However, some of those enclosures housed as many as 10 beagles each, which would require 60.4 square feet per enclosure. Sixty enclosures in another room measured around 39.7 square feet. Yet, ENVIGO co-housed up to 11 dogs in each enclosure, which would require at least 58.9 feet of space.

55.     Four months after APHIS advised ENVIGO of the negative impacts to dogs without the minimum amount of floor space (distress, discomfort, crowding, poor sanitation, increased trauma, and mortality), ENVIGO again violated an overcrowding regulation at the Cumberland Facility. In November 2021, APHIS found ENVIGO failed to provide a total of 742 dogs and weaned puppies with the minimum space mandated by the AWA. Six months later, in May 2022, ENVIGO still failed to provide dogs with the minimum space required at the Cumberland Facility.

56.     The AWA requires primary enclosures be structurally sound and maintained in good repair to protect animals from injury and to contain the animals. 9 C.F.R. § 3.6(a). At the Cumberland Facility, ENVIGO failed to protect the dogs from injury (9 C.F.R. § 3.6(a)(2)(ii)) and have flooring that protected the dogs' feet and legs from injury and did not allow the dogs' feet to pass through openings in the floor (9 C.F.R. § 3.6(a)(2)(x)).

57.     ENVIGO failed to prevent injury to dogs caused by the Cumberland Facility's flooring since at least the July 2021 APHIS inspection. APHIS notified ENVIGO that the kennel flooring was especially dangerous due to the gaps in the slatted floor that trapped the paws of dogs and puppies as young as six-to-seven weeks old. APHIS

inspectors at the Cumberland Facility observed dogs whose feet or toes were stuck in the slat flooring, or whose legs or feet had fallen through the flooring. On multiple occasions, these dogs required assistance to free their limbs.

58.     The problem increased after the July 2021 APHIS inspection when ENVIGO implemented daily rough hosing of the kennels at the Cumberland Facility. This practice led to slippery flooring that increased the frequency of dogs' limbs getting stuck or falling through the flooring. Although ENVIGO knew the flooring presented a constant risk to the dogs, it failed to correct the problem. APHIS cited ENVIGO for its inadequate flooring at every inspection conducted between July 2021 and May 2022. As late as May 3, 2022, APHIS found two dogs stuck in the flooring. One of the dogs required a couple of minutes of manipulation before ENVIGO employees could free her foot. The dogs at the Cumberland Facility spent each day on the noncompliant flooring until they were seized during the May 2022 federal search warrant or surrendered afterward.

59.     ENVIGO also failed to protect the dogs at the Cumberland Facility from injury by using a kennel system that allowed dogs to have their body parts bitten or pulled through the kennel walls by dogs in neighboring kennels. Dog enclosures must be constructed and maintained so that they keep other animals from entering the enclosure. 9 C.F.R. § 3.6(a)(2)(iv). This violation stemmed from other noncompliant activity at the facility: failing to maintain kennels in good repair to prevent gaps and loose kennel walls and failing to maintain overcrowding and compatible groups of dogs which can lead to aggressive disposition, fighting, injury, and death. *See* 9 C.F.R. §§ 3.1(a), 3.7.

60.     ENVIGO's failure to maintain kennels in good repair at the Cumberland Facility included using flooring that was not cut to the same size and shape as the kennel walls, resulting in large gaps in between the floor and fencing. This problem resulted in dogs falling or stepping into the gaps, resulting in injury to some dogs.

61.     At times, ENVIGO housed dogs in kennels with various other structural damages that created hazards and resulted in injuries to dogs at the Cumberland Facility. ENVIGO kept dogs in kennels with damaged access doors, damaged door frames, exposed gaps, rust, metal flashing, sharp points and edges, broken chain link, and unsecured walls and flooring. ENVIGO also used numerous broken waterers and feeders in the kennels.

SANITATION

62.     The AWA requires primary enclosures and food and water receptacles to be cleaned and sanitized. 9 C.F.R. § 3.11. ENVIGO was required to clean the primary enclosures at the Cumberland Facility daily to remove excreta and food waste, and to reduce disease hazards, insects, pests, and odors. 9 C.F.R. § 3.11(a). ENVIGO was also required to remove dogs from the primary enclosures when employees used water to clean the enclosures, unless the dogs would not be wetted in the cleaning process. 9 C.F.R. § 3.11(a).

63.     Until the July 2021 APHIS inspection, ENVIGO employees at the Cumberland Facility engaged in a practice of cleaning kennels once every two weeks. ENVIGO employees allowed feces to accumulate in the pens and troughs below. ENVIGO

failed to remove waste to the point that mold grew on piles of feces inside the troughs below the kennels.

64.     ENVIGO eventually installed black mats on top of the noncompliant flooring in some kennels at the Cumberland Facility, but the mats were not porous and allowed urine and feces to pool. Because the mats were not cleaned often enough, the dogs had to stand, sleep, or lie in their urine and feces. Pursuant to the AWA, the surface of housing facilities must be constructed to allow them "to be readily cleaned and sanitized, or removed or replaced when worn or soiled." 9 C.F.R. § 3.1(c)(1).

65.     In May 2022, many dogs were observed with painful and inflamed paws because of regular contact with dirty flooring at the Cumberland Facility. The AWA mandates housing facilities must have floors cleaned to ensure that all animals can avoid contact with excreta. 9 C.F.R. § 3.1(c)(3).

66.     When ENVIGO employees cleaned the kennels at the Cumberland Facility, they sprayed the kennels without first removing the dogs, or without drying the kennels before replacing the dogs. The enclosures were located opposite from a heat source, had no solid resting surface or bedding, and no functioning heat lamps. Even after APHIS notified ENVIGO of the heat source issue, ENVIGO failed to immediately resolve the problem and several puppies were found shivering in their enclosure days later.

67.     ENVIGO failed to sanitize some of the primary enclosure food and water receptacles at the Cumberland Facility. 9 C.F.R. § 3.11(b). Some automatic waterers inside the kennels were coated with a black mold-like substance, rust-colored debris, and grime.

Some feeders were inadequately and infrequently sanitized, resulting in unpalatable food for the dogs. APHIS notified ENVIGO of these issues as early as November 2021, but these conditions continued as late as May 2022. In March 2022, APHIS inspectors noted that grime was still present and had built up on several feeders.

<u>CONTAMINATED FEED AND DEPRIVATION OF FOOD</u>

68.     The AWA required ENVIGO to provide the dogs at the Cumberland Facility food that was uncontaminated, wholesome, palatable, and of sufficient quantity and nutritive value to maintain the normal condition and weight of the dogs. 9 C.F.R. § 3.9(a). ENVIGO was also required to store supplies of food to minimize contamination by excreta, pests, and water. 9 C.F.R. § 3.9(b). ENVIGO must have ensured that the food was not molding, and that the surfaces in the kennels in contact with the animals were "impervious to moisture." 9 C.F.R. §§ 3.9(b), 3.2(d).

69.     At times, ENVIGO fed some dogs at the Cumberland Facility food that was wet or contaminated with maggots, moldy, and interspersed with live insects. Additionally, the food receptacles were not kept in a manner to minimize contamination; they were not impervious to water and their placement allowed water and feces on the kennel floors to be sprayed back into the feeders. APHIS notified ENVIGO of the food contamination issues as early as July 2021, but these issues remained unresolved for months, and were observed again in March and May 2022.

70.     The AWA mandates that dogs must be fed at least once each day, except as otherwise might be required to provide adequate veterinary care. 9 C.F.R. § 3.9(a).

*Attachment 3 to Resolution Agreement*
*In re: Inotiv, Inc.*                                                    <u>Information</u>

ENVIGO withheld food from nursing mothers at the Cumberland Facility for multi-day periods and maintained this practice for several years. ENVIGO withheld food from mothers by turning the feeder attached to the enclosure around so it was inaccessible to the mother but remained in a position where she could see and smell the food. ENVIGO employees engaging in this practice signed forms falsely indicating the mothers had been fed on days when they had not.

71.     After APHIS inspectors, the Cumberland Facility's manager of operations, and AV instructed employees at the Cumberland Facility to cease the practice of withholding food, employees nevertheless agreed amongst themselves to continue the practice and did so for months. Those ENVIGO employees continued to falsely log that they checked the mother dogs' feed each day and ensured they had food, when in fact, they had not.

<u>HVAC AND SHELTER VIOLATIONS</u>

72.     The AWA mandates that the sheltered part of sheltered housing facilities must be "sufficiently heated and cooled when necessary" to protect the dogs from temperature or humidity extremes. 9 C.F.R. § 3.3(a). At "all times," dogs must be provided with adequate shelter from the elements to "protect their health and well-being." 9 C.F.R. § 3.3(d). Additionally, the ambient air temperature "must not rise above 85 degrees Fahrenheit for more than 4 consecutive hours" when dogs are present. 9 C.F.R.§ 3.2(a). Animals must be handled "in a manner that does not cause trauma, overheating, excessive

cooling, behavioral stress, physical harm, or unnecessary discomfort." 9 C.F.R. §
2.131(b)(1).

73.    ENVIGO maintained inadequate cooling mechanisms at the Cumberland
Facility. In July 2021, APHIS inspectors observed hundreds of dogs housed in areas that
had temperatures above 85 degrees Fahrenheit for at least 5 hours. Some of the affected
dogs were currently receiving medical treatment. Two months later in September 2021,
temperatures again exceeded 85 degrees Fahrenheit.

74.    For years, the Cumberland Facility did not have adequate cooling
mechanisms in its kennels. In early May 2022, to prepare for the summer months, ENVIGO
scheduled an air conditioning contractor to address the inadequate cooling mechanisms,
and a contractor arrived during execution of the May 2022 federal search warrant. That
action, however, was also inadequate and did not resolve the high temperatures in the
kennels.

75.    The winter months resulted in additional temperature-related violations at the
Cumberland Facility. In November 2021, APHIS inspectors cited the facility for failing to
maintain certain enclosure flaps allowing indoor and outdoor access for the dogs. Until
ENVIGO fixed the flaps, the flaps were damaged or missing resulting in element exposure,
including freezing temperatures, to the dogs.

## PESTS

76.    The AWA required ENVIGO to maintain a program for the control of pests
"so as to promote the health and well-being of the animals and reduce contamination by

pests in animal areas." 9 C.F.R. § 3.11(d). Pests were present throughout the buildings at the Cumberland Facility, including in dog food. The facility's dog feeders contained ants, flies, worms, and black beetles. Large feed bins at the facility contained cockroaches and flies.

77.    ENVIGO had a longstanding issue with pest control at the Cumberland Facility. APHIS notified the Cumberland Facility about its pest problems as early as August 2017. Years passed without resolution of the facility's pest issues and although ENVIGO employees notified members of the Executive Leadership Team of pest issues, ENVIGO treated the pervasive pest problem at the Cumberland Facility as an accepted characteristic of the facility rather than a violation of the AWA.

<u>RECORDS</u>

78.    The AWA required ENVIGO to maintain records "which fully and correctly" disclose certain information about the dogs under their control. 9 C.F.R. § 2.75(a)(1). The AWA particularly required ENVIGO to maintain records about the disposition of dogs (sale, death, euthanasia, donation). 9 C.F.R. § 2.75(a)(1)(i)–(ix).

79.    The AWA required ENVIGO to keep and maintain copies of medical records for dogs — including for at least one year after any given dog is euthanized — and make those records available for APHIS inspection. 9 C.F.R. § 3.13(b), (c)(2). ENVIGO's medical records were required to include identified problems with a dog, the date, and a description of the problem, examination findings, test results, a plan for treatment and care,

treatment procedures performed, vaccines and treatments administered, recommended testing, and the dates and findings of all screening. 9 C.F.R. § 3.13(b).

80.     The AWA required ENVIGO to make, keep, and retain records pertaining to the purchase, sale, transportation, identification, and previous ownership of each dog, which fully and correctly disclosed information about the animal purchased or otherwise acquired, owned, held, leased, or otherwise in his or her possession or under his or her control, or which is transported, sold, euthanized, or otherwise disposed of (including records of any offspring). 7 U.S.C. § 2140; 9 C.F.R. § 2.75(a)(1)–(3), (b)(1).

81.     ENVIGO failed to maintain and keep adequate records at the Cumberland Facility. The facility kept incomplete or missing euthanasia records, incomplete or vague mortality records, and missing disposition records for several dogs. Moreover, on several occasions ENVIGO employees falsely indicated necropsies were performed on deceased dogs when they were not.

82.     ENVIGO lacked sufficient dental records for the dog colony at the Cumberland Facility. The facility's vaccination record-keeping system resulted in inaccurate vaccination data for certain dogs. Medical records for certain dogs at the facility were incomplete; certain records lacked exam findings, descriptions of observed issues, and test results. Certain records also lacked descriptions of symptoms, diagnostic testing, treatment plans, and causes of death. Certain euthanasia records lacked information about the route of administration used by employees to administer euthanasia drugs.

## EMPLOYEES

83.     ENVIGO fell short of the requirements in the AWA by failing to maintain a sufficient employee-to-dog ratio at the Cumberland Facility and by allowing a system of inadequate veterinary care to persist at the facility. With regard to the number of employees, a facility must include a sufficient number of employees who are practicing husbandry under the supervision of an individual who the facility is "certain" has the knowledge, background, and experience in proper husbandry and care of dogs to supervise others. 9 C.F.R. § 3.12.

84.     ENVIGO was responsible for providing care to over 5,000 dogs at the Cumberland Facility. In July 2021, it employed merely 39 individuals to care for thousands of animals (128:1 dog/employee ratio, assuming all 39 employees were responsible for animal care and husbandry, which they were not). ENVIGO's inadequate work force resulted in deficient daily observations of dogs. Several dogs were found in need of critical care by APHIS inspectors as early as July 2021 at the Cumberland Facility, and by the May 2022 federal search warrant, 445 animals were classified as being in acute distress and needing immediate medical attention. ENVIGO failed to remedy its employee shortage at the Cumberland Facility months after being on notice of its inadequacy. ENVIGO's low staff levels at the facility led to various other violations of the AWA including inadequate veterinary care and sanitation practices.

*Attachment 3 to Resolution Agreement*
*In re: Inotiv, Inc.*                                                                                      **Information**

## ENVIGO EXECUTIVE LEADERSHIP TEAM KNEW OF THE AWA VIOLATIONS AT THE CUMBERLAND FACILITY

85.    From at least July 2021, members of ENVIGO's Executive Leadership Team knew the Cumberland Facility was operating in violation of the AWA. ENVIGO's COO visited the facility firsthand, and for months, discussed the facility's violations, including "deplorable" conditions at the facility, with other ENVIGO employees. The COO, VP-NOA, and SVP-VS took inadequate steps to bring the Cumberland Facility into full compliance with the AWA. In February 2022, seven months after being on notice of the issues at the Cumberland Facility, ENVIGO's VP-NOA described the conditions as "worse than I had seen" in July 2021.

86.    ENVIGO employees estimated a total cost of $8,000,000 for the improvements it deemed necessary to come into compliance with the AWA. Although requests for capital expenditures were made to improve the Cumberland Facility, members of the Executive Leadership Team delayed or declined such requests. Improvements that were made were insufficient.

## V.  THE CONSPIRACY TO VIOLATE THE AWA

87.    Beginning on or about January 1, 2020, and continuing up through and including May 18, 2022, within the Western District of Virginia and elsewhere, ENVIGO RMS, defendant herein, along with other persons both known and unknown to the United States, conspired to commit offenses against the United States, that is, to knowingly violate the provisions of the Animal Welfare Act, in violation of 7 U.S.C. § 2149(d).

PURPOSE OF THE CONSPIRACY

88.     It was the purpose of the conspiracy for ENVIGO and its coconspirators to unlawfully enrich themselves by, among other things, avoiding (1) millions of dollars in infrastructure upgrades, and (2) the hiring of the requisite trained and competent human resources necessary to bring the Cumberland Facility into compliance with the AWA.

MANNER AND MEANS OF THE CONSPIRACY

89.     The manner and means by which ENVIGO and its coconspirators, sought to accomplish the objects and purposes of the conspiracy included, among others, the following:

    a.  The conspirators concealed non-compliant features of the Cumberland Facility and its operations and procedures from APHIS during inspections.

    b.  The conspirators established a business culture that prioritized convenience and profits over compliance with the AWA and the humane treatment of animals.

    c.  The conspirators retained an inadequate attending veterinarian.

    d.  The conspirators failed to hire sufficient and adequate staff, which exacerbated its AWA violations.

    e.  The conspirators operated and maintained the Cumberland Facility wastewater treatment plant in violation of their permit and implemented interim measures rather than permanent infrastructure and operational

solutions, resulting in adverse impact to the health and welfare of the dogs housed therein.

<u>OVERT ACTS</u>

90.    In furtherance of the conspiracy, and to affect the objects thereof, at least one of the following overt acts, among others, were committed by at least one of the conspirators in the Western District of Virginia:

*Inadequate Veterinarian Care*

a.  On or about February 11, 2021, ENVIGO and its coconspirator, AV, failed to provide adequate veterinarian care at the Cumberland Facility while operating on five beagles.

b.  On or about February 16, 2021, after being informed that AV operated on dogs improperly, performed botched surgeries, failed to have necessary supplies for surgical procedures, misplaced medical records, mislabeled blood draw vials, failed to ensure healthy dogs were shipped from the Cumberland Facility, had poor attendance, and ignored weekend calls regarding veterinary issues, the conspirators failed to stop the inadequate care of the animals housed at the Cumberland Facility.

c.  Between February 2021 and May 2021, and despite repeated warnings that coconspirator AV was not providing dogs at the Cumberland Facility with adequate veterinary care, the conspirators repeatedly refused to terminate AV.

*Increased Risk of Death by Hypothermia*

d. On or about July 7, 2021, at the Cumberland Facility, an unindicted coconspirator washed dog kennels with a hose without first removing the dogs inside.

e. On or about July 8, 2021, at the Cumberland Facility, an unindicted coconspirator washed dog kennels with a hose without first removing the dogs inside.

f. On or about July 27, 2021, at the Cumberland Facility, two unindicted coconspirators washed dog kennels with a hose without first removing the dogs inside.

g. On or about October 26, 2021, at the Cumberland Facility, an unindicted coconspirator washed dog kennels with a hose without first removing the dogs inside.

*Improperly Withholding Food from Nursing Mothers*

h. Starting on or about August 2021 and continuing until at least October 2021, an unindicted coconspirator withheld food from nursing mother dogs for at least two-day periods at the Cumberland Facility against the direction of the Cumberland Facility's manager of operations and APHIS.

i. On or about August 13, 2021, that same unindicted coconspirator advised other ENVIGO employees to withhold food from nursing mother dogs at the Cumberland Facility.

j. On or about October 25, 2021, that same unindicted coconspirator falsely told APHIS inspectors nursing mother dogs were being fed every day at the Cumberland Facility when in fact they were not.

### Falsifying Required Records

k. In or around May 2021, two unindicted coconspirators falsified a log sheet used to record the temperature of the refrigerators in the Cumberland Facility's whelping building, knowing such conduct was in violation of the AWA.

l. On or about August 18, 2021, an unindicted coconspirator falsely indicated on a mortality record that a necropsy was performed at the Cumberland Facility on a deceased dog when in fact one was not, knowing such conduct was in violation of the AWA.

m. On or about October 25, 2021, an unindicted coconspirator falsely indicated on feeding forms that nursing mothers had been fed every day at the Cumberland Facility when in fact they had not.

### Improper Euthanasia Techniques

n. On or about April 25, 2021, an unindicted coconspirator did not sedate a dog before euthanizing it at the Cumberland Facility.

o. On or about June 1, 2021, an unindicted coconspirator instructed an ENVIGO employee not to sedate a dog before euthanizing it at the Cumberland Facility.

p.  On or about August 25, 2021, an unindicted coconspirator euthanized dogs and disposed of them without first verifying they were deceased at the Cumberland Facility.

*Sanitation & Drinking Water*

q.  On or about August 12, 2019, the conspirators provided non-potable drinking water to the dogs at the Cumberland Facility.

r.  On or about June 3, 2021, the conspirators provided drinking water contaminated with excessive levels of nitrates to the dogs at the Cumberland Facility, knowing the water was non-potable.

s.  In or around December 2021, the conspirators pumped water contaminated with fecal matter to the Cumberland Facility's kennels for ENVIGO employees to use to flush the troughs below the dog kennels.

All in violation of Title 18, United States Code, Section 371.

## <u>COUNT TWO</u>

1.     Paragraphs 1 to 14 of Count One are incorporated by reference as if fully set forth herein.

## I.     <u>CLEAN WATER ACT</u>

2.     The CWA was enacted to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

3.     The CWA prohibits the discharge of any pollutant into waters of the United States except in compliance with a permit issued pursuant to the CWA under the National

Pollutant Discharge Elimination System ("NPDES") or by the United States Environmental Protection Agency ("EPA") or by a state with an approved permit program. 33 U.S.C. §§ 1311(a), 1342.

4.      Under the NPDES permit program, persons, or entities who wish to discharge one or more pollutants must apply for a permit from the proper state or federal agency. *See* 40 C.F.R. § 122.21. A "permit" is "an authorization, license, or equivalent control document issued by EPA or an 'approved State' to implement the requirements of [the CWA]." 40 C.F.R. § 122.2.

5.      States can seek approval from the EPA to administer and enforce a CWA NPDES permit program. 33 U.S.C. § 1342(b). EPA's approval of a state program does not affect the United States' ability to enforce the Act's provisions. 33 U.S.C. § 1342(i). Therefore, violations of the CWA fall within the jurisdiction of the EPA even if the program is delegated to a state. EPA approved Virginia's NPDES program on March 31, 1975.

6.      The CWA defines "discharge of a pollutant" as the "addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). The term "pollutant" includes a wide range of materials, including solid waste, industrial waste, sewage, and sewage sludge. 33 U.S.C. § 1362(6).

7.      A "point source" is a "confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit [. . .] from which pollutants are or may

be discharged." 33 U.S.C. § 1362(14). Outfalls conveying wastewater and stormwater to surface waters are point sources.

8.     "Navigable waters" are defined in the CWA as "waters of the United States." 33 U.S.C. § 1362(7). "Waters of the United States" include rivers and streams which are "[c]urrently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce [. . .] [and the] [t]ributaries of such waters[.]" 40 C.F.R. § 120.2(a). Maxey Mill Creek, Deep Creek, and the James River are waters of the United States.

9.     NPDES permits typically contain, among other things, effluent limitations; water quality standards; monitoring and reporting requirements; standard conditions applicable to all permits; and special conditions where appropriate. *See* 33 U.S.C. § 1342; 40 C.F.R. §§ 122.41–122.50.

## II.     FACTUAL BACKGROUND

### THE CUMBERLAND FACILITY'S CWA PERMITS

10.     On September 8, 2015, Virginia's Department of Environmental Quality (VDEQ) issued CWA NPDES Permit No. VA0088382 ("Permit I") to Corporation B for the Cumberland Facility, with an expiration date of September 7, 2020. Permit I set forth certain requirements and prohibitions, including the following:

   a.   Effluent limits: Permit I set effluent limits for, among other things, Total Kjeldahl Nitrogen, *E. Coli*, Carbonaceous Biochemical Oxygen Demand, and Total Suspended Solids.

   b.   Foam discharges: Permit I prohibited the discharge of "visible foam in other than trace amounts."

c. Operation and Maintenance Manual Requirement: Permit I required the permit holder to "maintain a current Operations and Maintenance ("O&M") Manual for the treatment works." The O&M Manual must set forth "the practice and procedures, which will be followed to ensure compliance with the requirements of [the] permit." Permit I mandated that "[t]he permittee shall operate the treatment works in accordance with the O&M Manual."

d. Unauthorized Discharges: Unless authorized by Permit I, discharges of "sewage, industrial wastes, other wastes, or any noxious or deleterious substances" were prohibited.

e. Reporting requirements: Permit I required unauthorized discharges to be reported, immediately upon discovery of the discharge, but in no case later than 24 hours after said discovery with a written report submitted within five days of discovery of the unauthorized discharge. There were also reporting requirements for non-compliance.

f. Duty to comply: Permit I required compliance with all its conditions.

g. Proper Operation and Maintenance: Permit I required the permittee to operate and maintain the facilities to achieve compliance with its terms.

h. Licensed Operator Requirement:  Permit I required the permittee to employ or contract at least one Class 3 licensed wastewater works operator for the facility.

i. Duty to Mitigate:  Permit I required the permittee to take all reasonable steps to minimize and prevent any discharge or sludge use or disposal in violation of the permit which had a reasonable likelihood of adversely affecting human health or the environment.

11.    Permit I made clear that "[i]t shall not be a defense for a permittee in an enforcement action that it would have been necessary to halt or reduce the permitted activity in order to maintain compliance with the conditions of the permit."

12.     When EGSI acquired Corporation B and the Cumberland Facility in 2019, Permit I was transferred and placed in EGSI's name as the permittee. EGSI subsequently submitted a renewal application before the expiration deadline. In its 2021 renewal

application, EGSI estimated that it generated approximately 11.16 dry metric tons (or 24,597 pounds) of sludge per year at the Cumberland Facility.

13.    On March 1, 2021, VDEQ issued Permit No. VA0088382 ("Permit II") to EGSI. Permit II authorized the discharge into Maxey Mill Creek. Permit II, which expires on February 28, 2026, contained similar prohibitions and requirements as Permit I.

14.    Both Permit I and Permit II established discharge limits for, among other things, *E. coli*, Total Kjedahl Nitrogen ("TKN"), and total suspended solids ("TSS").

15.    Maxey Mill Creek, which bordered the Cumberland Facility, was a Section 10 navigable in fact water of the United States, located in the subbasin of the Middle James River. *See* Photograph 2 below.

**Photograph 2.** Aerial photograph of the Cumberland Facility's wastewater treatment plant and Maxey Mill Creek. (Source: Google Maps).



<u>THE CUMBERLAND FACILITY'S
WATERWATER TREATMENT PLANT</u>

16.     The Cumberland Facility produced sludge from dog and human waste that was treated onsite at the facility's wastewater treatment plant. The wastewater treatment plant functioned to treat the wastewater so the facility could ultimately discharge the effluent into Maxey Mill Creek in accordance with EGSI's VPDES permits (Permit I and Permit II) and recycle greywater to flush troughs.

17.     The Cumberland Facility wastewater treatment plant, which was originally constructed in 1995 with later upgrades in approximately 2001 and 2007, included two sequencing batch reactors ("SBRs"), two digesters, a sand filter, drying beds, an equalization tank ("EQ tank") (which held greywater), an effluent holding tank, and a chlorine contact tank. *See, e.g.*, Photograph 3 below.

**Photograph 3.** Marked Aerial photograph of the Cumberland Facility's wastewater treatment plant and Maxey Mill Creek. (Source: Google Maps, modified).



*Attachment C to Plea Agreement*
*United States v. Envigo RMS, LLC & Envigo Global Services, Inc.*

Page 36 of 48

18.     ENVIGO housed its dog colony at the Cumberland Facility in kennels inside multiple buildings. A trough system ran underneath all the kennels to collect the dogs' waste. A mechanical pit cleaner under the kennels collected the waste. Each kennel building had a pencil tank containing gray water which was used to flush the waste into a drain. The waste slurry was then gravity fed from the drain through an underground piping system to the Cumberland Facility wastewater treatment plant. In addition to the waste from the animal operations, human waste was piped to the wastewater treatment plant.

19.     Once the waste slurry reached the Cumberland Facility wastewater treatment plant, it was held in an underground piping system before going to either SBR 3 or SBR 4 to begin the treatment process. SBR 3 and SBR 4 were tanks that broke down the waste by separating solids from liquids to achieve biological removal of biochemical oxygen demand ("BoD") and ammonia. SBR 3 and SBR 4 had a total combined treatment capacity of around 90,000 gallons per day. SBR 3 and SBR 4 could be operated in a sequence set by a computer and timer system, or alternatively, manually operated.

20.     The SBR timer setting ensured the waste had enough time to react in the SBR 3 or SBR 4 before moving to the next step in the treatment process. During the SBR process, the waste filled, reacted, aerated, mixed, and settled. After the waste settled, the waste that settled to the bottom was sent into one of the digesters and the gray water on top was decanted.

21.     The Cumberland Facility wastewater treatment plant digesters held and further broke down the sludge from the bottom of SBR 3 and SBR 4 through an aeration

treatment process. For several years before August 2020, ENVIGO used only one of its digesters ("Digester No. 2") because the other digester ("Digester No. 1") was not working.

22.    The Cumberland Facility wastewater treatment plant decanter was set to a certain level and treated effluent was decanted to either the EQ tank or into the effluent holding tank. If the greywater went into the EQ tank, it was pumped back to the pencil tanks for reuse. If the greywater went to the effluent holding tank, it then passed through the sand filters and into the chlorine contact tank. At the chlorine contact tank, chlorine was added to the greywater and after at least thirty minutes of contact time, it was discharged into Maxey Mill Creek via the permitted outfall.

23.    EGSI employed a licensed wastewater treatment plant operator to manage the Cumberland Facility wastewater treatment plant, take the necessary samples, and ensure compliance with Permit I and Permit II effluent limits as well as the maintenance of the equipment.

24.    Permit I and Permit II required the licensed wastewater treatment plant operator at the Cumberland Facility to sample the wastewater treatment plant effluent prior to discharge into Maxey Mill Creek. However, the wastewater treatment plant operator sampled the effluent for chlorine, pH, dissolved oxygen, and temperature at a manhole after he began the discharge process.

25.    EGSI hired Environmental System Service ("ESS") to conduct additional wastewater testing at the Cumberland Facility, including testing for nitrates and *E. coli*, to ensure the effluent complied with the limits pursuant to Permit I and Permit II. ESS also

prepared discharge monitoring reports for EGSI based on the testing it performed. EGSI, as the permit holder, ultimately bore the responsibility for reviewing, executing, and submitting the reports to VDEQ.

26.     Along with discharging into Maxey Mill Creek, ENVIGO disposed of waste by land applying sludge on fields around the Cumberland Facility. ENVIGO land applied sludge on the Cumberland Facility property and on private property. ENVIGO was supposed to, but did not always, test the nutrient content of the sludge before land applying. ENVIGO land applied its sludge several days a month before August 2020.

27.     Beginning no later than 2020, VDEQ no longer permitted EGSI to land apply its sludge because it contained excessive levels of contaminants.

28.     Sometime in January 2020, the exact date unknown, the Cumberland Facility wastewater treatment plant operator notified managers at the Cumberland Facility of problems with waste management and requested help dealing with the waste.

29.     In 2021, the pump for Digester No. 1 failed and a backup pump was used. In 2022, the blower in SBR 4 failed. The repair for the blower took several weeks and the Cumberland Facility could not use SBR 4 at all during that time.

30.     Beginning in at least May 2021, the Cumberland Facility site director and manager of operations repeatedly requested capital expenditures from the Executive Leadership Team for improvements to the Cumberland Facility wastewater treatment plant. ENVIGO did not provide funds in response to those requests.

31.    By July 2021, APHIS required ENVIGO to change its sanitation practice from sanitizing the kennels only once every two weeks to every day, increasing the amount of water it used. In July 2021, the licensed operator at the Cumberland Facility made clear to managers at the Cumberland Facility that daily cleaning would be impossible, stating: "It will be absolutely impossible to clean all 80 troughs in 1 day. The plant can't process all that. It is operating now with about 85 percent solids in the SBR. Should be around 50." Per the O&M Manual, to function properly, the sludge percentage in SBR 3 and SBR 4 was recommended to be 30-50% of the volume.

32.    At the same time, ENVIGO did not reduce the number of dogs onsite at the Cumberland Facility. The increase in wastewater taxed the old, worn-out system, resulting in violations of Permit I and Permit II, including violations of the O&M Manual.

33.    As the volume of waste and water usage at the Cumberland Facility increased, along with the inability to either land apply or dispose of the sludge and a corresponding failure to follow the O&M Manual, the Cumberland Facility wastewater treatment plant no longer functioned as designed and could not properly treat the wastewater to ensure discharges in compliance with the permit limits.

34.    In late December 2021, ENVIGO began hauling some of its waste from the Cumberland Facility to a municipal wastewater treatment plant to provide additional capacity for the wastewater treatment plant. The municipal wastewater treatment plant required ENVIGO to sample its waste for compliance with the facility's pH, temperature, and nutrient requirements. At one point, the municipal wastewater treatment plant

temporarily suspended the Cumberland Facility's ability to haul waste to the municipal plant.

35.    In November 2021, ENVIGO contacted an engineering firm to draft a proposal for an upgrade to the wastewater treatment plant. In June 2022, and following two site visits, one of which took place in December 2021, the engineering firm provided a proposal to ENVIGO that estimated the required upgrades to the wastewater treatment plant would cost approximately $6,000,000. The engineering firm identified multiple necessary upgrades, including a new sludge dewatering facility, new chlorine contact tank and water pump station, new digester, and a new SBR. ENVIGO did not contract for the improvements and continued to use the failing system, without any reduction in the number of animals onsite at the Cumberland Facility until Summer of 2022. By a July 1, 2022, Transfer Plan, ENVIGO transferred ownership and physical custody of approximately 4,000 dogs to the Humane Society of the United States for placement into permanent homes. The transfer began on July 21, 2022, and all dogs were removed from the facility by September of 2022.

36.    Members of the Executive Leadership Team knew of the problems with the wastewater treatment plant and failed to take corrective action, thereby allowing the continued violations of discharge prohibitions and O&M requirements of Permit II.

## III.    <u>THE CONSPIRACY TO KNOWINGLY VIOLATE THE CWA</u>

37.    Beginning no later than January 1, 2020, and continuing up through and including September 30, 2022, within the Western District of Virginia and elsewhere,

ENVIGO GLOBAL SERVICES, INC., defendant herein, along with other persons, both known and unknown to the United States, conspired to commit offenses against the United States, that is: (1) to knowingly discharge pollutants from a point source into a water of the United States in violation of a permit issued pursuant to 33 U.S.C. § 1342, in violation of the CWA, 33 U.S.C. §§ 1311, 1319(c)(2)(A); and (2) to knowingly violate conditions of a permit issued pursuant to 33 U.S.C. § 1342, in violation of the CWA, 33 U.S.C. §§ 1311, 1319(c)(2)(A).

## PURPOSE OF THE CONSPIRACY

38.     It was the purpose of the conspiracy for the coconspirators to unlawfully enrich themselves by, among other things, (1) avoiding costs to properly dispose of wastewater and sludge as well as millions of dollars in infrastructure upgrades necessary to bring the Cumberland Facility into compliance with the CWA; and (2) continuing to breed and sell animals despite the Cumberland Facility's inability to manage the waste generated.

## MANNER AND MEANS OF THE CONSPIRACY

39.     The manner and means by which ENVIGO and its coconspirators sought to accomplish the objects and purposes of the conspiracy included, among others, the following:

   a.  The conspirators did not record when more than trace amounts of foam were visible at the outfall.

b.  When the wastewater treatment plant equipment began to fail, the conspirators implemented a rotation of cleaning troughs, as opposed to daily flushing, allowed feces to accumulate in the troughs instead of sending the waste to the wastewater treatment plant, and started to store the sludge in various tanks in the wastewater treatment plant.

c.  The conspirators discharged effluent into the Maxey Mill Creek knowing that such effluent would exceed the Cumberland Facility's applicable limits pursuant to Permit I and Permit II.

d.  The conspirators did not test the sludge at the Cumberland Facility to avoid having to report exceedances of phosphorus and other contaminants in the sludge before it was land applied.

e.  Notwithstanding known issues, *e.g.*, foam being discharged at times and the feces in the post-equalization decant tank, the Cumberland Facility licensed operator did not test the effluent until after it was being discharged into the Maxey Mill Creek.

*Attachment 3 to Resolution Agreement*
*In re: Inotiv, Inc.*

OVERT ACTS

40.     In furtherance of the conspiracy, and to affect the objects thereof, at least one of the following overt acts, among others, were committed by at least one of the coconspirators in the Western District of Virginia:

*Discharges in Violation of Permits I and II*

a.   In June 2020, an unindicted coconspirator discharged approximately 65,000 gallons of effluent from the Cumberland Facility into the Maxey Mill Creek. Sampling revealed that the discharge for TKN was 31% over the monthly-average Permit I limit.

b.   In August 2020, the same unindicted coconspirator discharged approximately 82,000 gallons of effluent from the Cumberland Facility into the Maxey Mill Creek. Sampling revealed that the discharge for TKN was 47% over the monthly-average Permit I limit.

c.   In January 2021, the same unindicted coconspirator discharged approximately 167,000 gallons of effluent from the Cumberland Facility into the Maxey Mill Creek. Sampling revealed that the discharge for TKN was 10% over the monthly-average Permit I limit.

d.   In May 2021, the same unindicted coconspirator discharged approximately 53,000 gallons of effluent from the Cumberland Facility into the Maxey Mill Creek. Sampling revealed that the discharge for TKN was 53% over the

monthly-average Permit II limit. Sampling revealed other effluent violations as well.

e.   In September 2021, the same unindicted coconspirator discharged approximately 58,000 gallons of effluent from the Cumberland Facility into the Maxey Mill Creek. Sampling revealed that the discharge for TKN was 67% over the monthly-average Permit II limit.

f.   In November 2021, the same unindicted coconspirator discharged approximately 42,000 gallons of effluent from the Cumberland Facility into the Maxey Mill Creek. Sampling revealed that the discharge for TKN was 157% over the monthly-average Permit II limit and 95% over the weekly-average Permit II limit. In addition, TSS was 75% over the Permit II limit.

g.   On multiple occasions, including in March 2021 and April 2021, the conspirators failed to report the discharge of visible foam leaving the Cumberland Facility through its wastewater treatment plant outfall into Maxey Mill Creek.

**Photograph 4.** Foam present at the wastewater treatment plant Outfall into Maxey Mill Creek on March 30, 2021. (Source: Environmental Consulting Firm)



*O&M Manual Violations*

h.  In August 2020, and in violation of the O&M Manual, the conspirators began

   storing sludge in Digester No. 1 as the volume of sludge increased and the

   Cumberland Facility had no ability to land apply or haul the sludge offsite.

   With no external relief for the system, the conspirators continued to move

   the sludge into different tanks in the Cumberland Facility wastewater

   treatment plant, even though the tanks were not intended to store sludge.

i.  The conspirators allowed the sludge to collect in the sludge tank and by July

   2021, allowed the volume in an SBR to exceed 85%.

    j.   On multiple occasions, the conspirators decanted wastewater from an SBR to the effluent holding tank and recycled it as part of the greywater system. The high volumes of sludge caused wastewater outside of compliance levels for BoD, nitrates, and TSS to be sent to the effluent tank, in violation of the O&M Manual. As a result, water the color of "chocolate milk" passed through the greywater system and was used to clean the troughs below the kennels. *See, e.g.*, Photograph 5 below.

**Photograph 5.** The Cumberland Facility wastewater treatment plant's "greywater" post-equalization decant tank on December 7, 2021. The "greywater" was used to clean troughs under the kennels. (Source: Third-party engineering firm).



All in violation of Title 18, United States Code, Section 371.

CHRISTOPHER R. KAVANAUGH
United States Attorney

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division

By: _____
Randy Ramseyer
Assistant United States Attorney
Western District of Virginia

By: _____
Banumathi Rangarajan
Senior Trial Attorney
Environmental Crimes Section

By: _____
Michelle Welch
Special Assistant United States Attorney
Western District of Virginia

By: _____
Sarah Brown
Trial Attorney
Environmental Crimes Section

By: _____
Corey Hall
Assistant United States Attorney
Western District of Virginia

By: _____
Carrie Macon
Assistant United States Attorney
Western District of Virginia